IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD ROGALINSKI,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>META PLATFORMS, INC.,<br><br>　　　　Defendant. | Case No. 22-cv-02482-CRB<br><br>**ORDER GRANTING MOTION TO DISMISS** |

Plaintiff Richard Rogalinski alleges that Defendant Meta Platforms, Inc. ("Meta") violated the First Amendment of the United States Constitution when it censoring his Facebook posts about COVID-19. See Compl. (dkt. 1). Purporting to represent a class of similarly situated Facebook users, Rogalinski alleges that Meta took this action in concert with the Biden Administration. Meta moves to dismiss, arguing that Rogalinsky has not pleaded state action. See MTD (dkt. 51). Finding oral argument unnecessary, the Court GRANTS the motion and denies leave to amend.

I.  **BACKGROUND**

　　A.　**Parties**

Rogalinski is a resident of Florida. Compl. ¶ 28.

The putative class members are individuals whose comments about COVID-19 were allegedly censored by Meta beginning on January 20, 2021. Id. ¶ 29. Rogalinski asserts that "[u]pon information and belief," the putative class contains potentially millions of members, but that only Meta knows the true number. Id. ¶ 61.

Meta is a corporation with its principal place of business in Menlo Park, California. Id. ¶ 30. Meta operates Facebook, among other online services. MTD at 1. In operating

Facebook, Meta deploys tools and resources to moderate content on the platform. Id.; Compl. ¶ 31.

### B.  Facts

#### 1.  Allegations Against Meta

Between April and June 2021, Meta appended warnings to or hid certain of Rogalinski's Facebook posts.  Compl. ¶ 37.  First, on or about April 6, 2021, Rogalinski posted a message doubting the efficacy of masks: "Some of that science stuff laying out how masks do nothing to prevent the spread of [COVID-19] and they're actually harmful to your health.  Haven't seen any of that science stuff saying otherwise.  Just talking heads who want to spread fear and control you."  Id.  Meta responded by appending a warning to the post that it was "missing context," and providing a link to a site with additional information.  Id.  Second, on May 6, 2021, Rogalinski posted another message critiquing the COVID-19 vaccine rollout, which he implied was part of Bill Gates' "depopulation agenda," and linking to an article by Fox News talk show host Tucker Carlson.  Id.; Ex. C (dkt. 1-3).  Meta responded by appending the same missing context warning.  Compl. ¶ 37.  Third, on June 13, 2021, Rogalinski posted a screenshot of a Tweet from a urologist promoting hydroxychloroquine as a cure for COVID-19.  Id.  Meta again responded by appending a warning to the post, this time labeling it as "false information" and hiding it from public view.  Id.

Although the complaint does not cite any other specific instances, Rogalinski asserts generally that "[t]he COVID-19 statements [on Facebook] of Putative Members of the Class were censored, or their statements made immediate subject of rebuke or discredit from the Defendant at the behest of the federal government."  Id. ¶¶ 38–39.  In his opposition, Rogalinski asserts that that the administration "specifically acknowledge[d] identifying at least 12 persons who are members of the described Class, which it targeted for censorship."  Opp'n (dkt. 57) at 5.

#### 2.  Statements by Federal Officials

Rogalinski alleges that Meta's "efforts to censor information had come in

communion with, if not at the behest of efforts by the Executive Branch of the Federal Government to restrict public statements and comments which clashed with the dogmatic narrative adopted by the new administration and Facebook." Id. ¶ 22.

At a press conference on July 15, 2021—after Meta took action against Rogalinski's posts—White House Press Secretary Jen Psaki responded to a question about the administration's "request for tech companies to be more aggressive in policing misinformation" by stating: "we are in regular touch with these social media platforms," and "[w]e're flagging problematic posts for Facebook that spread disinformation." Id. Psaki continued by outlining the administration's four recommendations for social media platforms: (1) measure and publicly share information on the impact of misinformation; (2) create a robust enforcement strategy across platforms; (3) act faster to take down harmful posts; and (4) promote quality information sources in their algorithms. Compl. Ex. A (dkt. 1-1) at 16–17. In support of cross-platform enforcement strategy proposal, Psaki noted that "there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms," and that "[a]ll of them remain active on Facebook, despite some even being banned on other platforms, including . . . ones that Facebook owns." Compl. Ex. A at 16.

### C. Procedural History

On July 19, 2021, Rogalinski filed his complaint in the District Court for the Middle District of Florida. Compl. After early delays due to confusion over Meta's agent for service, on February 10, 2022, Meta moved to dismiss the complaint or to transfer the case to this district in light of the forum selection clause in Facebook's Terms of Service. Mot. to Dismiss or Transfer (dkt. 27). On April 22, the case was transferred to this district. Order Granting Mot. To Transfer (dkt. 31). Meta now moves to dismiss, which Rogalinski opposes. MTD; Opp'n.

## II. LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be dismissed for failure to state a claim for which relief may be granted. Fed. R. Civ. P.

1    12(b)(6). Rule 12(b)(6) applies when a complaint lacks either a "cognizable legal theory"
2    or "sufficient facts alleged" under such a theory. Godecke v. Kinetic Concepts, Inc., 937
3    F.3d 1201, 1208 (9th Cir. 2019). Whether a complaint contains sufficient factual
4    allegations depends on whether it pleads enough facts to "state a claim to relief that is
5    plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic
6    Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff
7    pleads factual content that allows the court to draw the reasonable inference that the
8    defendant is liable for the misconduct alleged." Id. at 678. When evaluating a motion to
9    dismiss, the Court "must presume all factual allegations of the complaint to be true and
10   draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los
11   Angeles, 828 F.2d 556, 561 (9th Cir. 1987). However, it is "not bound to accept as true a
12   legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286
13   (1986); Clegg v. Cult Awareness Network, 18 F.3d 752, 754–55 (9th Cir. 1994).

   If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). A court has discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008).

**III.    DISCUSSION**

Meta moves to dismiss, arguing that Rogalinski has failed to plausibly allege that Meta was a state actor. The Court agrees.

   **A.    State Action**

The Ninth Circuit recently reaffirmed that "a private entity hosting speech on the Internet is not a state actor" subject to the Constitution. See Prager Univ. v. Google LLC, 951 F.3d 991, 995 (9th Cir. 2020) ("Despite YouTube's ubiquity and its role as a public-facing platform, it remains a private forum, not a public forum subject to judicial scrutiny

4

1    under the First Amendment."). The Supreme Court explained that "merely hosting speech by others is not a traditional, exclusive public function and does not alone transform private entities into state actors subject to First Amendment constraints." Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1930 (2019).

However, in rare cases, action by a private party can constitute state action. See Pasadena Republican Club v. W. Justice Ctr., 985 F.3d 1161, 1167 (9th Cir. 2021) (noting the four different tests that the Supreme Court has employed to determine if a private party engaged in state action). Rogalinski argues that Facebook engaged in state action under either of two theories: a "joint action" theory and a "nexus" theory. See Opp'n at 8–9.

### 1. **Hart v. Facebook**

Earlier this year, this Court heard Hart v. Facebook, in which the plaintiff also alleged that Meta (then Facebook) violated his First Amendment rights by flagging posts that allegedly contained COVID-19 misinformation. No. 22-CV-00737-CRB, 2022 WL 1427507 (N.D. Cal. May 5, 2022). Like Rogalinski, Hart relied on allegations about the July 15 press conference to show state action. Hart pointed to Psaki's statements, the Surgeon General's statements at the same press conference, and statements by President Biden encouraging companies to combat disinformation. See id. at 3.

The Court rejected Hart's arguments of joint action or government coercion and dismissed the claims against Facebook. Id. at 11. The Court based its order on at least four related but essentially independent grounds: (1) Facebook much more plausibly was enforcing its own misinformation policy; (2) the government's statements were phrased only as vague recommendations; (3) the government's supplying of information to Facebook did not plausibly suggest involvement in Facebook's decisions; and (4) there was no indication of government involvement in action specifically toward Hart. Id. at 10–14.

Rogalinski acknowledges Hart but argues for a different outcome on two grounds. See Opp'n at 4–8. First, Rogalinski contends that, while much of the censorship alleged by Hart and Rogalinsky had occurred before Psaki's statement, the putative class here also

includes the twelve individuals she mentioned, who purportedly suffered censorship later. Id. at 5.  Second, Rogalinski seems to argue that the Court in Hart mistakenly conflated Psaki's four recommendations for social media platforms (which were "clearly suggestions") with her comment about flagging problematic posts (which were "not merely advisory, but rather [was] taken in an effort to coerce compliance from the defendant").  See id. at 5–6.

These distinctions fail.  The twelve individuals Psaki mentioned are not relevant: Rogalinski cannot assert their claims without having a claim of his own.  See Sanford v. MemberWorks, Inc., 625 F.3d 550, 560 (9th Cir. 2010) ("When a named plaintiff has no cognizable claim for relief, she cannot represent others who may have such a claim." (cleaned up)).  And even if those individuals were relevant, Psaki mentioned them only in her discussion of the four recommendations that Rogalinski admits were "clearly suggestions."  See Compl. Ex. A at 16–17 ("There also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps. . . . Second, that we have recommended – proposed that they create a robust enforcement strategy . . . . there's about 12 people who are producing 65 percent of anti-vaccine misinformation. . . .").  Thus, on Rogalinski's own view, the government was merely "suggest[ing]" that the companies pay attention to these (unnamed) individuals.

Further, Rogalinski's distinctions address none of the other key grounds for this Court's conclusion in Hart.  Rogalinski "does not come close to pleading state action under either theory."  See Hart, 2022 WL 1427507, at *5.

### 2. Nexus and Joint Action

Rogalinski argues that the allegations satisfy the nexus test because "the State chose the targets and content of the statements that it deemed worthy of the Defendant's censorship," which indeed "resulted in actual censorship."  Opp'n at 10.  He contends that they satisfy the joint action test because the government and Meta "communicated directly and specifically about the censorship actions and did in fact engage in the act together by sharing responsibility for the two-step process of censorship, with each party being

6

responsible for half of the censorship action." Id. at 11.  The Court disagrees.  Because the tests largely overlap, it will address them together.  Accord O'Handley v. Padilla, No. 21-CV-07063-CRB, 2022 WL 93625, at *18 (N.D. Cal. Jan. 10, 2022) ("For the same reasons the Complaint does not meet the joint action test, it also does not meet the nexus test.").[1]

The nexus test "asks 'whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so the action of the latter may be fairly treated as that of the state itself.'"  Gorenc v. Salt River Project Agr. Imp. & Power Dist., 869 F.2d 503, 506 (9th Cir. 1989) (citing Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351 (1974)); see also Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950, 955 (9th Cir. 2008) (listing factors to consider, including whether the funds of the organization come from the state and whether state officials dominate its decision-making).

Similarly, the joint action test asks "whether the state has 'so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity."  Gorenc, 869 F.2d at 507 (quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961)).  "[A] bare allegation of such joint action will not overcome a motion to dismiss."  DeGrassi v. City of Glendora, 207 F.3d 636, 647 (9th Cir. 2000).  The Supreme Court has explained:

> [A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.  Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives.

Blum v. Yaretsky, 457 U.S. 991, 1004–05 (1982).  And this circuit requires "substantial cooperation" or that the private entity and government's actions be "inextricably

---

[1] At times, Rogalinski also gestures at the argument that Facebook was coerced by the government. See Opp'n at 7 (arguing that Psaki's statements were aimed at "coercing compliance from the Defendant who had not been as cooperative as the federal government would have liked"). Yet Rogalinski later abandons it. See Opp'n at 13 ("There's no indication that Facebook was forced into its part of this endeavor . . . the Defendant acted willfully and voluntarily . . . ."). In any case, the Court agrees that there is no indication that any coercion occurred. See Zhou v. Breed, 2022 WL 135815, at *1 (9th Cir. Jan. 14, 2022).

intertwined." Brunette v. Humane Society of Ventura Cnty., 294 F.3d 1205, 1211 (9th Cir. 2002). Although "[a] conspiracy between the State and a private party to violate constitutional rights may also satisfy the joint action test," id., the private and government actors must have actually agreed to "violate constitutional rights," Fonda v. Gray, 707 F.2d 435, 438 (9th Cir. 1983).

First, as in Hart, the allegations strongly suggest that Meta's decisions were entirely its own. As Rogalinski admits, "pressure began to mount" on Meta before Psaki's statement, and Meta had formed a "dogmatic narrative about COVID-19 and its vaccinations." Compl. ¶¶ 18–19. Rogalinsky admits that Meta took action against (what it viewed as) COVID-19 misinformation before any government statement. Indeed, all of the alleged censorship against Rogalinski occurred before any government statement. Hart, 2022 WL 1427507, at *6. At the press conference, Psaki noted that Meta had already taken action to ban some people from certain platforms. Compl. Ex. A at 16. Rogalinski has not rebutted the eminently plausible conclusion that Facebook acted alone. See Hart, 2022 WL 1427507, at *7–8 (noting that Facebook's Terms of Service established that (1) the company had a misinformation policy; and (2) it enforced it); see also Twombly, 550 U.S. at 557 (allegations of secret illegal conduct are insufficient where they are consistent with plausible legal explanations).

Second, even if the government assisted companies in identifying users who posted alleged misinformation, Rogalinski fails to allege that the government ever had any focus specifically on him. See Children's Health Def. v. Facebook Inc., 546 F. Supp. 3d 909, 933 (N.D. Cal. 2021) (finding no state action absent an allegation that a state actor took "specific action with regard to [plaintiff] or its Facebook page"); Daniels v. Alphabet Inc., 2021 WL 1222166, at *6 (N.D. Cal. Mar. 31, 2021) (same where "[p]laintiff does not allege that the federal government directed a particular result with respect to his . . . videos"). Rogalinski emphasizes that Psaki supposedly admitted to focusing on twelve individuals. Opp'n at 5. But Psaki never indicated that the government was targeting them; she only recommended that social media companies create cross-platform strategies.

8

See Compl. Ex. A at 16.  And Rogalinski fails to identify the individuals or their posts, so he does not plausibly allege that they suffered injury or that the government participated in that injury.  Furthermore, even if the government did target these individuals—and even if it took joint action against them—Rogalinski fails to plausibly allege that he is in this group or sufficiently comparable in influence to have suffered the same treatment.

Third, even if the government provided Meta with information about Rogalinski, that (without more) is insufficient because the government can work with a private entity without converting that entity's later decisions into state action.  See Blum, 457 U.S. at 1010 (finding no state action where government did not "dictate the decision . . . in a particular case").  In Mathis v. Pacific Gas Company, 75 F.3d 498, 501 (9th Cir. 1996), PG&E conducted an undercover operation in close partnership with the county narcotics Task Force, after which PG&E made a "decision to exclude [the plaintiff] from the plant."  The plaintiff argued that PG&E's decision was joint action attributable to the county because the decision was based on information uncovered in the investigation.  The Ninth Circuit disagreed, emphasizing that the plaintiff's "challenge is limited to PG&E's decision-making process after the investigation was completed."  Id. at 504.  "Whether or not [the county's] previous acts facilitated the decision, the mantle of its authority didn't."  Id.  PG&E independently decided to exclude the plaintiff, so there was no joint action.  Id.

In O'Handley, this Court applied Mathis to find no state action.  2022 WL 93625, at *10.  The Court noted O'Handley's argument that "without [the government's] flagging O'Handley's tweet to Twitter, [he] wouldn't have had his first tweet labeled."  Id. (cleaned up).  But the Court observed that Mathis had rejected this exact argument: PG&E may have used information from the government investigation, but its decision was still its own.  O'Handley had failed to allege state action because "there is no evidence or even allegation that the government played any role in Twitter's 'internal . . . decisions,' to label [his] tweets, or to add strikes to and ultimately suspend [his] account."  Id. (quoting Mathis, 75 F.3d at 504).  So too with Meta's internal decisions about Rogalinski.  As the Court explained in Hart:

9

> [E]ven if the White House had specifically communicated with these companies about Hart's post or tweet, [the companies'] enforcement of [their] policy as to that post or tweet would still not be joint action. One party supplying information to another party does not amount to joint action. See Lockhead v. Weinstein, 24 Fed. App'x 805, 806 (9th Cir. 2001) ("[M]ere furnishing of information to police officers does not constitute joint action"); Fed. Agency of News, 432 F. Supp. 3d at 1124 ("supplying information to the state alone [does not amount] to conspiracy or joint action") (alteration added). The one-way communication alleged here falls far short of "substantial cooperation." See Brunette, 294 F.3d at 1212. After all, the Federal Defendants did not "exert[] control over how [Facebook or Twitter] used the information [it] obtained." See Deeths v. Lucile Slater Packard Children's Hospital at Stanford, 2013 WL 6185175, at *10 (E.D. Cal. Nov. 26, 2013).

Hart, 2022 WL 1427507 at 7. Aligned interests or "mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives." Blum, 457 U.S. at 1004–05.

As Rogalinski fails to plead state action under either his joint action or nexus theories, his First Amendment claim fails as a matter of law. And because Rogalinski does not come close to alleging state action, the Court concludes that amendment would be futile and denies leave to amend. Leadsinger, 512 F.3d at 532.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the motion to dismiss without leave to amend.

**IT IS SO ORDERED.**

Dated: August 9, 2022

CHARLES R. BREYER
United States District Judge